IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 5:10CR201 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge John R. Adams |
| v. | ) | |
| | ) | |
| CLIFTON L. COUSINS, | ) | GOVERNMENT'S SENTENCING |
| a.k.a. ABDULLAH JIHAD AL-MALIK | ) | MEMORANDUM |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through its undersigned counsel, Steven M. Dettelbach, United States Attorney for the Northern District of Ohio, Assistant United States Attorneys Justin E. Herdman and Christos N. Georgalis, and respectfully submits this Sentencing Memorandum, which summarizes the United States' position that the Defendant, Clifton L. Cousins, (hereinafter, "the Defendant") should be sentenced to a term of 180 months' imprisonment, to be served consecutive to sentences of imprisonment already imposed for prior state and federal convictions.

The United States Pretrial Services and Probation Office (hereinafter, "the Probation Office") has prepared a Presentence Investigation Report (hereinafter, "PSIR") for the Defendant.  Using the November 1, 2010 edition of the United States Sentencing Guidelines Manual (hereinafter, "the Guidelines" or "U.S.S.G."), the Probation Office calculated the Total

Offense Level, including an enhancement for the Defendant's status as a Career Offender under U.S.S.G. § 4B1.1 and a reduction for Acceptance of Responsibility under U.S.S.G. § 3E1.1, to be 29. The Defendant's Criminal History Category was calculated at VI based on a total of 23 criminal history points and his status as a Career Offender. Accordingly, the guideline range for a sentence of imprisonment under the U.S.S.G. is 151 to 188 months.

In this Memorandum, the government explains why this Court should sentence the Defendant to 180 months' imprisonment, consecutive to all sentences imposed for prior convictions, which is within the properly-calculated advisory Guidelines sentence range. This Memorandum outlines: (1) a brief history of the case; (2) the counts of conviction; (3) a discussion of the properly-calculated range of imprisonment under the U.S.S.G. and the absence of any grounds for a departure under the Guidelines; and (4) an analysis of a sentence of 180 months' imprisonment as reasonable and consistent with the statutory sentencing factors set forth in 18 U.S.C. § 3553.

## I. <u>Case History</u>

On May 4, 2010, an eight count indictment was filed charging the Defendant with the following crimes stemming from June 2006 (Counts One through Four) and October 2009 (Counts Five through Eight):

- Count One: Title 18, United States Code, Section 876(b) – Mailing extortionate communications;

- Count Two: Title 18, United States Code, Section 115(a)(1)(A) – Threatening to murder the immediate family of a United States Judge;

- Count Three: Title 18, United States Code, Section 115(a)(1)(B) – Threatening to murder a United States Judge;

- Count Four: Title 18, United States Code, Section 844(e) – Mailing a Threatening Communication to Damage or Destroy a Building;

- Count Five: Title 18, United States Code, Section 876(b) – Mailing extortionate communications;

- Count Six: Title 18, United States Code, Section 115(a)(1)(A) – Threatening to murder the immediate family of a United States Judge;

- Count Seven: Title 18, United States Code, Section 115(a)(1)(B) – Threatening to murder a United States Judge;

- Count Eight: Title 18, United States Code, Section 844(e) – Mailing a Threatening Communication to Damage or Destroy a Building;

At the time the indictment was filed, the Defendant was serving a state prison sentence in the Ohio Department of Corrections; as a result, he was arraigned on June 22, 2010. On August 17, 2010, the Court granted the Defendant's motion for a competency examination, which was completed and returned with findings that the Defendant was competent to stand trial. On January 28, 2011, the Defendant entered pleas of guilty to all eight counts of the Indictment. Subsequent to the entry of these guilty pleas, the Court granted an additional motion by the Defendant for a neuropsychological examination to test for any physical abnormalities. This test was completed and received by the Court on October 5, 2011. A sentencing hearing has been scheduled for November 15, 2011.

On May 16, 2011, the Probation Office prepared and submitted a final PSIR for the Defendant. Having reviewed this document, along with previous reports prepared by the Probation Office in anticipation of a guilty plea in this matter, the United States submits that the PSIR correctly determines the applicable Guideline range at 151 to 188 months' imprisonment for the Defendant.

3

## II.    Counts of Conviction

### A.    Counts One and Five: 18 U.S.C. § 876(b)

As noted above, the Defendant pled guilty to two counts of mailing threatening communications to Judge Dowd with the intent to extort a "thing of value."  With respect to Count One, a letter mailed in June 2006, the "thing of value" sought was an order from Judge Dowd releasing the Defendant from the custody of the Ohio Department of Corrections and into federal custody, which the Defendant had deemed "better equipped" for purposes of self-rehabilitation.  To communicate this extortionate demand, the Defendant threatened to behead Judge Dowd's wife, children, and dog.  The Defendant explicitly referenced the victims of his previous homicides, stating that he should be taken seriously and "you should have seen the look on [the victims'] face[s] when they knew they were going to die."  The Defendant also threatened to destroy federal buildings "by way of explosion" if this demand was not met.

As to the letter mailed in October 2009, charged in Count Five, the "thing of value" the Defendant sought was Judge Dowd's assistance in renouncing the Defendant's United States citizenship.  This letter contained a fine white powder inside, which the Defendant described as "arsenic."  In addition to the purported arsenic, the threats levied by the Defendant in this letter included an opening line to Judge Dowd stating plainly "I know it's been awhile but I hope you didn't think I've forgotten [a]bout you, I've thought a million times on how I can kill you and your family."  The letter stated that Judge Dowd might be killed by way of a pipe bomb in the federal courthouse.  The letter also stated that if Judge Dowd did not assist the Defendant in renouncing his citizenship within one week, he would be "dead" either at the Defendant's hands or through action by the Defendant's "soldiers."

4

The statutory punishment for this offense, as set forth in 18 U.S.C. § 876(b), is a term of imprisonment of up to twenty years.  Thus, the U.S.S.G. sentencing range of 151 to 188 months' imprisonment falls under the statutory maximum for this offense.

With respect to the statutory language of 18 U.S.C. § 876(b), the government notes that case law favors a substantially broad reading of "thing of value" to encompass intangible objects that are not easily assigned a monetary value.  Indeed, the Eleventh Circuit Court of Appeals has deemed "thing of value" a "term of art which the courts generally construe to envelope both tangibles and intangibles."  *United States v. Nilsen*, 967 F.2d 539, 542 (11th Cir. 1992) (*citing United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979)).  The subjective value assigned to the "thing" may be established by the conduct and expectations of both the defendant and the recipient of the threat.  *Id*., at 543.

Where the threats levied by defendants intersect with the judicial system, a "thing of value" has been supported by evidence that the extortion attempt was designed to extract some intangible advantage.  For instance, courts have found that threats designed to prevent witness testimony, *Nilsen*, 967 F.2d at 543; *United States v. Zouras*, 497 F.2d 1115, 1121 (7th Cir. 1974), and dismissal of felony counts, *United States v. Scott*, 884 F.2d 1163, 1166 (9th Cir. 1989), were extortionate demands for a "thing of value" under 18 U.S.C. § 876(b).

Thus, the value placed by the Defendant on the "things" sought in the extortionate demands should be viewed through the lens of the relative merit to him, as well as the obvious authority position of Judge Dowd.  Certainly the Defendant viewed transfer to the federal prison system as a thing of value – he stated in the April 24, 2006 letter that the federal system was better-equipped for rehabilitation.  The Defendant further stated in this letter that such

5

rehabilitation has value even if he were never to be released from prison, as he would at least know that he "did my best for my kids."  Judge Dowd himself, in the response to the Defendant, acknowledged, as well, "why [the Defendant] would prefer to be in the federal system for confinement rather than the state system."

In a similar vein, in October 2009, the Defendant obviously placed value in renouncing his United States citizenship.  The Defendant stated that he had renounced his citizenship because he was not a part of America – "never have never will be."  The Defendant also included a two-page handout with instructions on the renunciation process, which is clear evidence that he valued renunciation enough to devote time to researching the steps needed to accomplish it. Furthermore, the letter from the Defendant seems to infer, once again, that Judge Dowd's assistance would be required to release him from custody, as the renunciation paperwork requires that the oath of renunciation take place in a foreign country.  As further stated by the Defendant during an October 30, 2009 interview with investigators at SOCF, the fundamental reason for the Defendant seeking to renounce his citizenship was the belief that it would speed his release from custody – clearly a "thing of value" he tried to extort through mailed threats and purported poisons.

### B.      Counts Two and Six: 18 U.S.C. § 115(a)(1)(A)

The statutory penalty for the 18 U.S.C. § 115(a)(1)(A) violation, threatening to assault and murder the family of a United States judge, includes a term of imprisonment of up to 10 years.  The Sixth Circuit has held that a threat must be evaluated under an "objective" test, whereby a defendant may be convicted of making a threat even where he possesses no subjective intent to carry out such a threat.  *United States v. Vincent*, 681 F.2d 462, 464 (6th Cir. 1982)

6

(evaluating threat to kill President of the United States under 18 U.S.C. § 871).  "[W]e set a standard under 18 U.S.C. § 115 which does not require that an actual subjective intent to carry out the threat be present." *United States v. Smith*, 928 F.2d 740, 741 (6th Cir. 1991).  Regardless of a defendant's subjective intent to carry out the threat, the crime does include an element that the threats are made to with intent to "impede, intimidate, or interfere with [the] judge… while engaged in the performance of official duties" or to "retaliate against [the] judge… on account of the performance of official duties."  18 U.S.C. 115(a)(1)(B).

Likewise, a defendant's incarceration status weigh against the nature of the threat itself.  In *United States v. Glover*, 846 F.2d 339, 344 (6th Cir. 1988), the Sixth Circuit considered this issue in a case where a prisoner sent threats to the President of the United States:

> Appellant argues that because the letters were sent from inside a prison, no reasonable person could perceive them as being a true threat.  We believe the threats made in the letters sent to the President were of a nature that a reasonable person would foresee that the receiver of the letters would perceive them to be a serious intention to inflict bodily harm upon or take the life of the President. If the appellant's argument were accepted, no prisoner could be convicted under this statute, since his argument seems to be premised on the idea that prisoners are incapable of carrying out threats, therefore, no reasonable person could consider such a threat to be a true threat. This premise is faulty.

As will be discussed further below, the Defendant clearly made not only an objective threat, but manifested an honestly-held, subjective intent to harm Judge Dowd and his family.  In June 2006, the Defendant made explicit threats to behead Judge Dowd's wife and children.  In order to convey the severity of this threat, the Defendant made reference to individuals and an organization, including the international terrorist group Al Qaeda, with whom he claimed

7

affiliation.  The Defendant also made reference to escaping from prison in order to carry out his threats.

In October 2009, the Defendant also threatened that he had "thought a million times on how I can kill you and or your family."  In this letter, the Defendant gave a detailed description of the ease with which he could escape from prison, including a rundown of the weapons carried by prison officials.  Once again, the Defendant referenced individuals working on his behalf outside the prison walls, including "my soldiers."

**C.**      **Counts Three and Seven: 18 U.S.C. § 115(a)(1)(B)**

For violations of 18 U.S.C. § 115(a)(1)(B), threatening to assault and murder a United States judge, as charged in Counts Three and Seven, the statutory penalty includes a term of imprisonment of up to 10 years for each such offense.  The legal analysis of these counts is substantially the same as those for Counts Two and Six; the letters sent by the Defendant constitute explicit, clear threats to kill Judge Dowd.

**D.**      **Counts Four and Eight: 18 U.S.C. § 844(e)**

For violations of 18 U.S.C. § 844(e), threatening to damage or destroy a building by means of fire and explosive, as charged in Counts Four and Eight, the statutory penalty includes a term of imprisonment of up to 10 years for each such offense.  Such threats need not be made through the mailing of any actual or purported explosive device, or any such present capability to do so.  *United States v. Leaverton*, 835 F.2d 254, 257 (10th Cir. 1987) (government was not required to establish that defendant, who was state prisoner, had actual capability to successfully accomplish threatened action); *see also United States v. Viefhaus*, 168 F.3d 392, 395-97 (10th Cir. 1999) (§ 844(e) conviction upheld where defendant made threatening statements on

8

recorded hotline); *United States v. Spruill*, 118 F.3d 221, 227-28 (4th Cir. 1997) (over 200 phone calls made to FBI and DEA offices threatening to "blow up" buildings sufficiently established "true threat" requirement under § 844(e)).

Again, as discussed below, the Defendant did not shirk from delivering a clear, impactful point – despite  his incarceration, he remained capable of carrying out an explosive attack.  He plainly conveyed the gravity of the threat to cause "federal buildings to fall by way of explosion" in June 2006.  In order to demonstrate this seriousness, the Defendant invoked his past homicide convictions, of which Judge Dowd was clearly aware, by declaring that "People never took things serious just like the people I'm in jail for murdering…"   Then in October 2009, the Defendant took more comprehensive steps to lay out not only his desire to explode pipe bombs in the federal courthouse, but his ability to do so.  These steps included sending a letter to the Sandusky Register claiming a pipe bomb discovered in Huron County was placed there by the Defendant's followers, "the Army of Allah."

## III.  Imposition of Sentence

The Probation Office employed a three-step analysis in developing the Defendant's PSIR. First, the statutory penalties were described.  Presentence Investigation Report, at 27.  Second, the appropriate guideline range was determined.  Id.  Third, any possible guideline departures were identified.  Id., at 30.  Fourth, it was determined whether a variance should be considered, pursuant to 18 U.S.C. § 3553(a).  Id., at 30-31.

### A.    Guidelines Range

The Court's task is to impose a sentence that is sufficient, but "not greater than necessary" to comply with the factors set forth in 18 U.S.C. § 3553(a)(2).  In achieving this task,

9

district courts are to consider the Sentencing Guidelines *together* with the statutory factors set forth in § 3553(a).  *See United States v. Booker*, 543 U.S. 220, 246 (2005).  Although advisory, the Guidelines "should be the starting point and the initial benchmark" in all sentencing proceedings.  *United States v. Gall*, 128 S. Ct. 586, 596 (2007); *United States v. Anderson*, 526 F.3d 319, 329 (6th Cir. 2008).  *See also United States v. Griffin*, 530 F.3d 433, 439 (6th Cir. 2008) (district court must properly calculate and consider the advisory Guidelines); *United States v. Brattain*, 539 F.3d 445, 447 (6th Cir. 2008) (same).  Indeed, a sentence may be considered unreasonable when the court "fails to consider the applicable Guidelines range . . . ."  *United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008) (internal quotations omitted).  In fact, the Sentencing Guidelines are generally considered to be a "rough approximation" of a sentence that would "achieve § 3553(a)'s objectives."  *Rita v. United States*, 551 U.S. 338, 350 (2007).

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."  *Rita*, 551 U.S. at 349.  The Sentencing Guidelines "'seek to embody the § 3553(a) considerations, both in principal and in practice.'"  *United States v. Haj-Hamed*, 549 F.3d 1020, 1027 (6th Cir. 2008) (*quoting Rita*, 551 U.S. at 350).  "For even though the Guidelines are advisory rather than mandatory, they are . . . the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."  *Gall*, 128 S.Ct. at 594.  "The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."  *Id*., at 596 n. 6.

10

With respect to Counts One through Eight, the PSIR calculated a combined adjusted offense level of 20.  The adjusted offense level was then increased to 32 by operation of U.S.S.G. § 4B1.1, which was reduced by 3 additional levels for acceptance of responsibility.  The total offense level for Counts One though Eight thus amounts to 29.  Coupled with a Criminal History Category VI, the Guideline sentencing range is 151 to 188 months' imprisonment for the Defendant.

As noted above, Counts One and Five carry a statutory maximum penalty of 20 years' imprisonment.  Counts Two, Three, Four, Six, Seven and Eight have a statutory maximum punishment of 10 years' imprisonment.  Accordingly, as a result of the convictions on Counts One and Five, the properly calculated advisory Guidelines range is 151 to 188 months' imprisonment for the Defendant.

**B.    Consecutive Sentence**

The Sentencing Guidelines provide that if "the instant offense was committed while the defendant was serving a term of imprisonment… or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment."  U.S.S.G. § 5G1.3(a).  The Court is further authorized to impose a sentence consecutive to an undischarged term of imprisonment under 18 U.S.C. § 3584, subject to the sentencing factors enumerated in 18 U.S.C. § 3553.

Here, the Defendant is currently serving an undischarged state prison sentence of 15 years to Life.  The Defendant has also been sentenced, but has not yet commenced service of, a term of 60 months' imprisonment for his federal conviction stemming from the 2001 threat to President Bush.  Hence, a Guidelines sentence would impose a term of imprisonment for the

11

instant offense to be served consecutive to both of the Defendant's undischarged terms of imprisonment for his prior state and federal convictions.

### C.    Departures

"The defendant bears the burden to prove by a preponderance of the evidence that the circumstances of his or her case warrant a downward departure." *United States v. Holz*, 118 Fed.Appx. 928, 931-32 (6th Cir. 2004) (*quoting United States v. Lipman*, 133 F.3d 726, 730 (9th Cir. 1998)).  *See also United States v. Bostic*, 371 F.3d 865, 874 (6th Cir. 2004) (defendant bears burden of proving a downward departure is warranted).  A Guidelines-based departure is, of course, conceptually distinct from a non-Guidelines variance.  *United States v. Grams*, 566 F.3d 683, 686-87 (6th Cir. 2009).  Whereas departures are grounded in Guidelines provisions, variances flow from the court's analysis of the § 3553(a) factors.  *Id.*

If the Court is contemplating a departure "from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission," it must give the parties "reasonable notice."  Fed. R. Crim. P. 32(h); *United States v. Erpenbeck*, 532 F.3d 423, 443 (6th Cir. 2008).  *See also Irizarry v. United States*, 128 S. Ct. 2198, 2203 (2008) ("Rule 32(h) remains in effect today . . . .").  Accordingly, it should be noted that the Probation Office did not "identif[y] any factors that may warrant a departure outside of the advisory guideline range of imprisonment" in the PSIR.  Presentence Investigation Report, at 30.

When determining whether a Guidelines-based departure is justified, a district court must consider the following factors:

(1) What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case? (2) Has the Commission forbidden departures based on those features? (3) If not, has the Commission encouraged departures based on those features? (4) If not, has the Commission discouraged departures based on those features?

*Erpenbeck*, 532 F.3d at 440 (*citing Koon v. United States*, 518 U.S. 81, 95 (1996)).

Additionally, only certain grounds for departure are permissible.  Pursuant to U.S.S.G. § 5K2.0(d)(1), the Court may not depart from the applicable Guideline range for a number of factors, including the defendant's national origin, religion, socio-economic status, or his/her disadvantaged upbringing.  The Guidelines also identify a number of discouraged factors for granting a departure.  A departure under these factors may be granted – but only under extraordinary circumstances.  *See* U.S.S.G. Chapter 5, Part H (Specific Offender Characteristics). These factors include, *inter alia*, age, mental and emotional conditions, and family ties and responsibilities.  *Id*.

Accordingly, no downward departure should be granted.  As a result, the advisory Guidelines range of 151 to 188 months' imprisonment should be imposed.

### IV.  Title 18, United States Code, Section 3553 Factors

As noted above, the sentencing court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in § 3553(a)(2), including "the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

13

In fashioning a sentence that is sufficient, but not greater than necessary to comply with the purposes set forth in § 3553(a)(2), the Court must also consider: "the nature and circumstances of the offense and the history and characteristics of the defendant" under 18 U.S.C. § 3553(a)(1); "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines" under 18 U.S.C. § 3553(a)(4)(A); "any pertinent policy statement . . . issued by the Sentencing Commission . . . " under 18 U.S.C. § 3553(a)(5)(A); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." under 18 U.S.C. § 3553(a)(6).

While it is not necessary for the district court to "engage in a ritualistic incantation of the § 3553(a) factors," its reasoning should be "sufficiently detailed to reflect the considerations listed in § 3553(a) and to allow for meaningful appellate review." *Moon*, 513 F.3d at 539 (internal quotations and citation omitted). Simply stated, a sentencing judge is not required to "expressly state each of these factors at sentencing." *Mayberry*, 540 F.3d at 518. However, if the district court determines that "an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is *sufficiently compelling* to support the degree of the variance." *Erpenbeck*, 532 F.3d at 437 (*quoting Gall*, 128 S. Ct. at 597) (emphasis added). A variance "based on a policy disagreement with the Guidelines . . . may be entitled to less respect" and be "suspect" on appeal. *Spears v. United States*, 128 S.Ct. 586, 599 (2007); *see United States v. Herrera-Zuniga*, 571 F.3d 568, 585-86 (6th Cir. 2009).

As will be demonstrated below, the § 3553(a) factors not only support a sentence at the highest end of the advisory guidelines range for the Defendant, but would even justify an upward

14

variance. These same factors also support a sentence to be served consecutively to the Defendant's undischarged terms of imprisonment. The Defendant stands convicted of attempting to extort favorable treatment from a United States Judge by threatening to kill not only the judge himself, but members of his immediate family. A sentence of 180 months' imprisonment – to be served consecutive to the Defendant's undischarged terms of imprisonment – reflects the seriousness of these offenses, as Congress and the Sentencing Commission have made clear. It is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law." *Gall v. United States*, 128 S.Ct. 586, 599 (2007); *see* 18 U.S.C. § 3553(a)(2)(A). Moreover, appropriately reflecting the seriousness of these offenses in turn promotes deterrence and protects the public from further harm from the Defendant and others who share his contempt for the United States, the judicial process, human life, and all respect for law. Finally, a sentence of 180 months' imprisonment imposes a reasonable and fair punishment in light of other similarly situated defendants. Taking these factors into account, the Defendant should receive – at the very least – a term of 180 months' imprisonment to be served consecutive to his undischarged terms of imprisonment, as the properly-calculated Guidelines sentence would suggest.

### A. Title 18, United States Code, Section 3553(a)(1) Nature and Circumstances of the Offense & History and Characteristics of the Defendant

The nature and circumstances of this offense span a period of roughly six years. At its core, this offense constitutes a prolonged campaign by the Defendant to intimidate, harass, and evoke favorable judicial treatment from Judge Dowd, all through a very deliberate series of explicit threats levied at the judge and his family. Ultimately, the Defendant's letter-writing

15

culminated in the mailing of a white powder, which was boldly proclaimed by the Defendant to be "arsenic," to the chambers of Judge Dowd in October 2009.  Following the indictment in this case, the Defendant delivered a final missive to Judge Dowd in May 2010 – yet another threatening letter, this time mailed along with a brownish substance, which was later identified as human feces.  The nature and circumstances of the offense, along with the history and characteristics of the Defendant, merit the sentence recommended by the government.

The Defendant has spent almost his entire adult life in the custody of the Ohio Department of Corrections, where he is currently serving a sentence of 15 years to Life in prison.[1]  As outlined in the PSIR, the Defendant has been convicted of committing a number of the most serious violent crimes chargeable under the Ohio Revised Code, including three separate homicides (including one immediately following a rape), an aggravated robbery with a sawed-off shotgun, arson in a prison facility, and felonious assault in a prison facility.  At some point while serving the prison sentences imposed for these crimes, the Defendant became an inmate at the Southern Ohio Correctional Facility in Lucasville, Ohio (hereinafter, "SOCF").[2]

In December 2001, following the terrorist attacks against the United States that autumn (which included several mailings of a powder containing anthrax virus), the Defendant sent a letter from the SOCF to President George W. Bush.  This letter stated plainly that the recipient

---

[1] As indicated on the Ohio Department of Corrections website, the Defendant's next parole hearing is scheduled for January 2016.  The government has no additional information at this time with respect to the Defendant's parole eligibility.

[2] During this time frame, the Defendant has stated that he converted to Islam and took the Arabic name Abdullah Jihad Al-Malik.  Obviously, the religious preference of the Defendant is of no relevance to the offense whatsoever except insofar as it explains certain letters that are signed with his Arabic name.  According to the PSIR, the Defendant has since renounced Islam and his Arabic name.  Presentence Investigation Report, at 22.

16

had been exposed to anthrax, declared allegiance to Osama Bin Laden, and threatened that President Bush would be murdered and die by the hands of "us Muslim [sic]."  Presentence Investigation Report, at 20.  When interviewed about the letter at the Ohio State Penitentiary in Youngstown, Ohio, the Defendant wrote a statement in which he again threatened to kill President Bush or, in the alternative, the President's daughters.  Government's Sentencing Exhibit A, at 5.

In April 2004, the Defendant was charged in the Northern District of Ohio with threatening President Bush and the case was assigned to Judge Dowd in the Akron Federal Courthouse.  While appearing before Judge Dowd on May 5, 2004, a Deputy United States Marshal noticed that a support arm of the Defendant's eyeglasses was missing.  Government's Sentencing Exhibit B.  A search was conducted at the Defendant's cell in the Mahoning County Justice Center, where the missing support arm – sharpened into a deadly point – was found carefully concealed within a lotion bottle.  Just four days after the discovery of this weapon, the Defendant stated to a prison guard that he planned to take a hostage as soon as the opportunity arose, since this was the only way he could "get what he wanted."

In November 2004, the Defendant pled guilty to all three counts of that indictment:  two counts of threatening the President of the United States, in violation of 18 U.S.C. § 871, and one count of threatening the family of the President, in violation of 18 U.S.C. § 879.  In January 2005, Judge Dowd sentenced the Defendant to 48 months' imprisonment, which was to be served consecutive to any state prison sentence.  While the Defendant appealed this sentence, he sent a polite and respectful letter to Judge Dowd, which was received on April 24, 2006.  Government's Sentencing Exhibit C.  This letter requested Judge Dowd's assistance in

17

immediately transferring the Defendant to federal prison (rather than fulfill the condition imposed by the judge at sentencing that the Defendant serve his federal sentence of imprisonment consecutive to any state sentence). In the letter, the Defendant stated his belief that the federal system is "better equipped" for the purposes of rehabilitation. Judge Dowd responded two days later, stating that he did not possess the legal authority to assist the Defendant in this manner. Government's Sentencing Exhibit D.

Apparently incensed at the denial of this request, the Defendant responded by launching a contemptuous letter to Judge Dowd's chambers, which was received on June 2, 2006.[3] Government's Sentencing Exhibit E. This letter stated that "you people in [the] Akron courthouse choose to sentence me inadequately and falsely" and that "[y]ou even denied to help me get to the federal system." The Defendant then proclaimed that his "organization" – which he described as an Al-Qaeda cell and "fully aiding in the cause of Osama Bin Laden" – would aid in his escape from the SOCF. The Defendant then threatened to "behead your wife, dogs, kids" and stated that "federal buildings [would] begin to fall by way of explosion." The Defendant also invoked his prior homicides. As a parting shot, the Defendant wrote "You have the choices of contacting the federal court and letting them [know] that you gave me a false

---

[3] This letter references "Mr. Becker" (AUSA Robert Becker was the prosecutor in the Defendant's 2004 threat case) in the second sentence of the body of the document. There is no addressee in the letter itself. The government can confirm that AUSA Becker did receive this same letter from the Defendant during this time period. Any objective view of the letter sent to Judge Dowd, however, must clearly acknowledge it as a threat to the judge himself. For instance, there is no cover letter stating the Court has been provided a "courtesy copy," nor is there any effort in the body of the letter to distinguish between the prosecutor and the court. Rather, when viewed in light of the Defendant's earlier request of Judge Dowd, this communication is rightfully viewed as a threat to the judge and his family.

conviction or else you die along with Bush's Administration."  This letter was signed "Abdullah Jihad Al-Malik."  On the envelope, the return address was to "Clifton Le'Anthony Cousins" and included the Defendant's inmate number at SOCF.[4]  In addition, the letter was very clearly mailed from the SOCF.

The Defendant's appeal was ultimately successful and his case returned to Judge Dowd for re-sentencing.  On May 16, 2007, Judge Dowd re-sentenced the Defendant to a term of imprisonment of 60 months – the statutory maximum – to be served consecutive to any state prison sentence.   Government's Sentencing Exhibit A.   In the written memorandum accompanying the pronouncement of sentence, Judge Dowd stated:

> The defendant's history of violent conduct, coupled with his obvious unstable mental condition as reflected in the presentence report, and as further indicated in the medical records of the defendant while incarcerated, strongly suggest that this defendant should never again be pardon, paroled, or released into society. The danger that the defendant would present to society, be it at the conclusion of his state sentence, when and if paroled, or upon the completion of the consecutive federal sentence in this case, is abundantly obvious when one studies the defendant's record of criminal conduct accompanied by his continuing belief that it is proper to engage in threats to kill anyone involved in his prosecutions, be it the United States Attorney, the sentencing judge, or the wife of the sentencing judge. Threats to kill have more credibility when the person who threatens the killing has already demonstrated, as does this defendant, the ability to kill another person for whatever reason. The Court is struck with the fact that the most recent threat to behead the Court's wife is accompanied by a history of having previously killed two women, so it is apparent that this defendant is not deterred from homicide where a woman is the victim.

---

[4] This number has been redacted from all Government Sentencing Exhibits.

The next communication from the Defendant to Judge Dowd occurred on October 21, 2009, when a letter was received in the judge's chambers.[5]  The envelope contained a two page letter, three separate sheets of paper, and a small plastic baggie containing a white powder.  Government's Sentencing Exhibit F.  The envelope was opened by a relief judicial assistant, who immediately contacted the United States Marshals Service in the Akron Federal Courthouse.  Upon responding, the Marshals were able to make out threats to the judge and the word "arsenic" in the body of the letter.  As a result, the Akron Fire Department's Hazardous Materials Unit responded, along with a number of federal agencies.  The powder was field-tested and determined to be negative for any biological or chemical toxins; this preliminary finding was later confirmed through more comprehensive testing performed by the Ohio Department of Health.

The text of the letter revealed that, although nearly two and one-half years had passed, the Defendant had not forgotten about Judge Dowd.  In the opening line of the letter, the Defendant stated, quite simply, "I've thought a million times on how I can kill you and or your family."  The Defendant then stated that at any time, Judge Dowd might find a pipe bomb in his restroom at work (in the courthouse) or might find himself poisoned by the white powder included in the letter, which the Defendant claimed was a "sample" of arsenic.  The letter then demanded that Judge Dowd "promise me within a week you'll help obtain proper paperwork for

---

[5] Judge Dowd was not present in the Akron Courthouse on this date.

renunciation or else you['re] dead." The envelope included two pages of information related to the process for renouncing United States citizenship.[6]

About one week later, a letter from the Defendant was received at the Sandusky Register. In this letter, which was dated October 27, 2009, the Defendant claimed that a recent pipe bomb found in Huron County was a "test bomb." Government's Sentencing Exhibit G. The Defendant related the size of the pipe bomb, although these details were readily available in an online news article on the Sandusky Register website. Government's Sentencing Exhibit H.[7] The letter also referenced the previous week's mailing to Judge Dowd, stating that "I told federal Courts Judge David Dowd Jr. in Akron Ohio… if I did [sic] obtain what I wanted that People would die by way of pipe bombs." The Defendant also stated that although he was incarcerated, he wanted Judge Dowd to know that "I have a way to be out and touch them." Once again, the letter referenced Al-Qaeda and Osama Bin Laden. At the closing, the Defendant stated, "This is serious and always remember (The Army of Allah) we do the works of the Angel of Death."

On the same day he wrote the letter to the Sandusky Register, the Defendant wrote another letter to Judge Dowd. This letter, which was received in the judge's chambers on November 2, laid out the Defendant's belief that Judge Dowd and federal agencies were plotting to kill him. Government's Sentencing Exhibit I. Ominously, the Defendant warned Judge Dowd

---

[6] During an interview with SOCF Investigator David See on October 30, 2009, the Defendant explained that his motive for seeking renunciation of U.S. citizenship related to his desired release from prison. The Defendant told Investigator See that once he had renounced his U.S. citizenship, he would necessarily be released from prison and deported to another country. A DVD of this interview will be provided under separate cover to the Court.

[7] This article was written fully five days before the date of the Defendant's letter and three days after the date on his letter to Judge Dowd containing the white powder.

that "I keep my eyes open cause the streets is always talkin and I know what I know plus my eyes is on you at work, at your beautiful home everywhere you go, I want you to know Im [sic] there see the things you do."  The Defendant closed by stating that he was a step ahead of Judge Dowd and claimed "I'll be right back after these messages."

On October 30, 2009, the Defendant was interviewed by Investigator David See of the SOCF.[8]  Throughout the interview, which is approximately 25 minutes in length, the Defendant spoke candidly and soberly about his motivations for sending the letter, all of which stemmed from a desire to get out of SOCF.  Indeed, the Defendant plainly stated that he threatened Judge Dowd in order to be transferred out of SOCF.  The Defendant's ire towards Judge Dowd was evident throughout the interview, as he also stated that he made the threats because Judge Dowd falsified documents.  At the same time, the Defendant denied writing the threatening letter to President Bush that formed the substance of his 2004 case in Akron Federal Court.  The Defendant also stated his belief that he would eventually be released from custody, since he had "Shephardized" cases and found that there was no precedent for anyone serving an indeterminate sentence of 15 to Life actually serving a full life sentence.  The Defendant also stated that even if he had to kill somebody, one way or the other he would get out of SOCF – dead or alive.  The interview apparently had an effect on the Defendant, as he ceased communication with Judge Dowd again until after the instant indictment was filed.

In March 2010, the Defendant was interviewed by FBI Special Agent Brian Carroll. Government's Sentencing Exhibit J.  During this interview, the Defendant admitted to writing all

---

[8] As noted above, the government will provide a DVD of this interview under separate cover to the Court.

three of the October 2009 letters discussed above, although he stated he could not recall actually mailing the two letters to Judge Dowd.[9]  The Defendant stated, with respect to Judge Dowd, "I despise that judge."  The Defendant stated that he held Judge Dowd personally responsible for having "tricked" him into pleading guilty to threatening the President.  Once again, the Defendant alleged that he had outside contacts capable of carrying out his threats.  Again with regard to Judge Dowd, the Defendant said, "If I wanted him dead he would be already."  The Defendant also stated simply that the letters were written in order to obtain a transfer out of SOCF.

On May 13, 2010 – about one week after the indictment in this case was filed – another letter from the Defendant was received in Judge Dowd's chambers.  This letter was never opened by the Judge's staff and was immediately turned over to the FBI.  The letter inside the envelope was stained through with a brownish-yellow liquid, which was later determined to be consistent with human feces.  Government's Sentencing Exhibit K; Government's Sentencing Exhibit L.  As might be expected, given the course of communications from the Defendant, the letter contained a vicious series of threats against the Court and the United States government.  Government's Sentencing Exhibit M.  The Defendant threatened a pipe bomb campaign that would target not only Judge Dowd, but repeatedly stated that he would target the judge's family.  The letter closed by stating "Your dead dead dead dead Judge walking" and directed a final three pages of chilling threats at Judge Dowd and his children, wife, and mother.  The final paragraph

---

[9] The authorship of these letters has never been a subject of serious dispute.  The FBI conducted a latent print examination of the October 21, 2009 letter received by Judge Dowd. This analysis indicated that three of the Defendant's fingerprints were found on the renunciation paperwork included in the envelope.  Government's Sentencing Exhibit N.

of the letter references the human feces enclosed in the letter, which the Defendant declared as his "seed," and targeted, yet again, Judge Dowd's wife.

Finally, on May 18, 2010, a letter from the Defendant was received by the Clerk of Courts for the United States District Court, Middle District of North Carolina in Greensboro. <u>Government's Sentencing Exhibit O</u>.  This letter informed the recipient that, thanks to Judge Dowd, the federal courthouse in Greensboro would witness a bomb attack that would kill everyone in the building.  The letter stated, "It's a new day new era death to all you non[] believers you and the people of your court house will die 1 week and a half from the day this letter is received."  The letter also referenced Al-Qaeda and the Defendant's "Army of Allah."

    **B.**    **Title 18, United States Code, Section 3553(a)(2)(A)**
                  **Seriousness of Offense; Promote Respect for the Law; Provide Just**
                  **Punishment for the Offense**

The Defendant's utter contempt for the legal system, judicial process, and operation of government is literally an exhausting task – fully eight pages of this memorandum are devoted to setting forth the Defendant's history of disdain for, and active disruption of, this District Court and the United States government as a whole.  The Defendant has spared no wrath in spewing his sadistic taunts and threats, as presidents, prosecutors, and judges have found themselves to be ripe targets for his explicit descriptions of murder and torture.  Perhaps most disturbing, though, has been the Defendant's constant inclusion of family members into these threats.  Realizing, no doubt, that the intended effect of the threat is heightened by describing violence to be visited upon wives and daughters, the Defendant has been especially gruesome in detailing the murders of women in his letters.

Above all, however, the nature of the Defendant's crimes is ultimately one of attempted manipulation of the judicial system.  Kept under lock and key for the bulk of his life, the Defendant resorted to the only machinations available to him for changing his personal circumstances.  When frustrated with his treatment at SOCF, the Defendant requested (politely, of course) that Judge Dowd provide him an accommodation by "converting" his state time to federal time.  When informed that the judge had no such authority, the Defendant lashed out in a violent screed that threatened to behead Judge Dowd's wife and children.  Obviously, the utility of such a measure was not lost on the Defendant.  When in October of 2009 he again desired to be transferred from SOCF, this time he upped the ante considerably by including a white powder in the threat letter to Judge Dowd.  In the Defendant's own words, this was done deliberately to provide him, however temporarily, respite from state prison.

The method by which he has sought to terrorize the Court further demonstrates the Defendant's complete lack of regard and respect for the rule of law.  By using the prison mail system in order to send out ostensibly "legal mail" to a federal judge, the Defendant has been able to circumvent the normal administrative measures in place to prevent such criminal acts. This Defendant has willfully made a mockery of the very system put in place to defend full adjudication of his rights and the rights of other prisoners.  Instead of properly availing himself of the legal process, then, this Defendant has sent, under the guise of legal correspondence and at taxpayer expense, a series of extortionate demands, threats to murder, a white powder held out to be a deadly toxin, and his own excrement.

Perhaps no area better demonstrates the Defendant's lack of respect for the law, and this Court, than his repeated attempts to manipulate the psychiatric evaluation system.  Throughout

his time in prison, the number of psychiatric evaluations performed on the Defendant is nearly countless.  In this case alone, the Defendant has been referred twice for psychiatric evaluations – both of which revealed strong indications that the Defendant was "malingering" and expressing psychiatric symptoms that simply did not comport with the findings.  Indeed, this Defendant went so far as to claim that he had been shot in the head while a teenager, thereby necessitating a neuropsychological examination of his brain.[10]  The tests revealed absolutely no evidence that a bullet had struck the Defendant's head.

Nor is the Defendant even remotely ashamed of this crass confidence game.  In the June 2006 letter to Judge Dowd, he states "I can't be in Ohio penitentiary cause they been fooled by my manipulative skills to believe that I have a mental problem[]!" Government's Sentencing Exhibit E.  In addition, the Defendant stated flatly to Investigator See in October 2009 that he "manipulated" the mental health system and could "play crazy."

The Defendant has demonstrated that he will go to great lengths in order to satisfy his desire to be free from the Ohio state prison system.  He has threatened the President of the United States, a United States judge, a federal prosecutor, and their wives and children.  He has manufactured, and hidden away, a deadly weapon fashioned from an innocuous pair of eyeglasses.  He has threatened to take hostages in order to get what he needs.  He has sent a white powder purporting to be a poisonous powder to the Akron Federal Courthouse.  He has mailed feces to the chambers of Judge Dowd.  Within his means as a state prisoner, the

---

[10] Oddly, the Defendant did not report this incident during an interview with the Probation Office in his previous federal case, although he did relate being struck in the head with a baseball bat.  Presentence Investigation Report, January 19, 2005, at 16.  The government will provide a copy of this report under separate cover to the Court.

Defendant has made every possible effort to subvert the functioning of this Court.  Only a sentence of the greatest severity – 180 months' imprisonment – can adequately address the severity of this offense, the Defendant's lifetime of abject scorn for the law, and the need for a just punishment.

### C.     Title 18, United States Code, Section 3553(a)(2)(B) Adequate Deterrence

Sadly, there is likely no prison sentence that can adequately deter the Defendant from engaging in any future criminal activity, let alone the sending of threatening letters.  The best evidence of this unfortunate fact comes from the Defendant himself.  In addition to apologizing to Judge Dowd, the Defendant now states that he is "resolved in my heart not to engage in this type of behavior again." Presentence Investigation Report, at 11.  These words ring hollow when compared to the statement he gave to U.S. Probation during the preparation of his PSIR in 2004, following his guilty pleas to threatening the President:  "I'm sorry.  What I did was wrong.  I take full responsibility for my actions.  I ain't going to do it no more.  They ain't got to worry about that."[11]  Presentence Investigation Report, January 19, 2005, at 5.[12]  Not only has the Defendant committed this same crime again, repeatedly, but he has since raised the stakes by mailing white powders and his own feces.

With the past as a reliable guide, even the harshest sentence imposed in this case is likely to witness, at some future date when the Defendant's desires are waylaid or disappointed, a

---

[11] As noted above, the government will provide a copy of this report under separate cover to the Court.

[12] Of course, the Defendant now blames Judge Dowd for "tricking" him into the convictions for that very offense. Government Sentencing Exhibit J.   He also denied commission of this crime in his October 30, 2009 interview with Investigator See at SOCF.

relapse into violent outbursts and demands backed by threats.  With the Defendant currently serving an indeterminate 15 to Life sentence in state prison, to be followed (if in the event of a parole) by a consecutive sentence of 60 months' imprisonment in federal prison, only the imposition of additional severe sentences can even hope to deter the Defendant.  A sentence of 180 months' imprisonment – imposed consecutive to the Defendant's undischarged terms of imprisonment – acts to serve this purpose, albeit imperfectly.

> **D.  Title 18, United States Code, Section 3553(a)(2)(C)
> To Protect the Public from Further Crimes of the Defendant**

The Defendant is a violent recidivist who has murdered, assaulted, and robbed his way into a life of state prison.  The tremendously prolific nature of the Defendant's criminal history is all the more astounding given that he has been fully incarcerated since the age of 21 (and sporadically for long periods of time prior to that).  In short, the Defendant apparently knows no life other than crime and is equipped with no responses to obstacles and frustrations other than violence.  This is witnessed not only by his frightening interactions with Judge Dowd, but also by the shocking matter-of-fact manner in which he described to a prison guard how he planned to take a hostage in 2004 (just a few short days after a sharpened weapon was discovered in his cell).

By his own admission, the Defendant's repeated efforts to terrify Judge Dowd stemmed from frustration, a condition that is certainly not confined to prisoners.  Presentence Investigation Report, at 10.  Should the Defendant ever be released, he would pose a very real threat not only to Judge Dowd and his family, but to any member of the public who denied the Defendant of any perceived entitlement or led him to feel "frustrated."  The Defendant, who is currently 43 years

28

old, in all likelihood faces a life sentence in Ohio's state prison system.  In the event, however improbable, that he is paroled, this Court must ensure that he pose no future threat to the public by imposing a substantial sentence – 180 months' imprisonment – to be served consecutive to both his state sentence and prior sentence of federal imprisonment.

**V.**  **Conclusion**

For the foregoing reasons and those to be presented at the sentencing hearing, the Court should impose a sentence of 180 months' imprisonment to be served consecutive to the Defendant's prior, undischarged terms of imprisonment.

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney


By:      /s/Justin E. Herdman
         Justin E. Herdman
         Assistant U.S. Attorney
         Reg. No. 0080418
         801 West Superior Avenue
         Cleveland, Ohio  44113
         Tel. No.:  (216) 622-3965
         Fax No.:  (216) 685-2378
         E-mail:   justin.herdman@usdoj.gov


By:      /s/Christos N. Georgalis
         Christos N. Georgalis
         Assistant U.S. Attorney
         Reg. No. 0079433
         801 West Superior Avenue
         Cleveland, Ohio  44113
         Tel. No.:  (216) 622-3971
         Fax No.:  (216) 522-8355
         E-mail:   chris.georgalis@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 28th day of October, 2011, a copy of the foregoing *Government's Sentencing Memorandum* was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

<div style="margin-left: 50%;">

<u>/s/ Justin E. Herdman</u>
Justin E. Herdman
Assistant U. S. Attorney

</div>

<div style="text-align: center;">30</div>